10-6136, 11-5828, 11-5825, and 12-5695 United States of America v. Christopher F. Smith and Michael P. Smith Arguments not to exceed 10 minutes for each defendant and 20 minutes for the plaintiff. And Mr. McKenna or Michael P. Smith may proceed. This was a long case, judges. I know you reviewed the record. It was enormous. We have a month-long trial here, and in that trial, the government never proved, with enough evidence, that Mr. Smith knowingly joined an agreement to commit fraud or that at least one act in furtherance was committed. The government alleged between 2003 and 2008, just briefly, that investors were induced by false statements and a failure to disclose material information and that they hired inexperienced people and drafted misleading reports. But the record shows otherwise, Your Honors. What it shows is that Target was a legitimate business that engaged in a speculative area of oil and gas production. What we have here is a company that spent large sums of money to be successful. The company was created in good faith. The wife and the husband, Mr. Smith, engaged in efforts with an attorney and a CPA to create the company and do research. They marketed to accredited investors off a sales lead list. They spent a lot of money to target what they called accredited investors, investors who had a certain amount of money and sophistication to engage in this sort of investment. And that's a normal thing to do. A business, for example, that sells Mercedes would not go after clientele that couldn't afford to do that. And when you're talking about large sums of money like you are here, you need to invest in people who are willing to do that. They engaged in legitimate accounting with an independent CPA. And most importantly, Your Honors, Target drilled for the wells they said they would. What you have here is a company that engaged an enormous amount of people and spent a lot of sums of money and used much equipment to drill when they said they would. This is not a situation where they simply took in money from investors and said, see you later, thanks for the money. Wasn't there a lot of testimony about misrepresentations made? There was, Your Honor, but there was also a lot of testimony from investors who said they were not misrepresented. They felt that Target dealt fairly with them. And in their brochures that they received, Your Honor, it said that this was speculative and they should consult with experts. And that's why they targeted those type of people. Weren't there some things in the brochures about like an oil well gushing oil that in fact wasn't even one of the Target oil's wells? Well, there was things in the brochures about oil wells, and they may have used pictures of wells that weren't theirs. But the testimony shows that Mr. Smith actually instructed the geologist not to lie, to tell the truth. And he told Ray Garton, who was the primary geologist, to only use truthful information. But after a while, Garton wasn't even doing the prospecting himself, was he? That is correct, Your Honor. If there's any weakness in what happened, it would be that. But what we don't have is was that a normal business practice or not. Mr. Garton testified that he originally went to the well sites himself, and eventually he did not. But then he testified that the information he provided was truthful, and he did not manipulate the information or provide inaccurate information. Of course, he doesn't know whether it was truthful or not because he didn't do the geology. He did not himself, but what he testified to was the sources. But he was relying on your client, wasn't he? He relied on geological surveys done by other geologists in terms of the geological information that he provided. Now, there is some sales involved in this. I mean, you know, the brochures, they didn't lie. Is there puffing? I don't know. Perhaps there was, but that's not unusual. The question is, was there intentional fraud? That's what they were found guilty of. How many of your clients took in, what, 15 million range? They did, Your Honor. And paid out, what, less than half a million? That is correct. But we have testimony from Mr. Briney. He testified on behalf of Target, and he said that 25 percent of wells ever hit, and only 10 percent are commercially successful. Was Briney a CPA or geologist? He was a field manager, Your Honor. He testified that he had extensive field experience drilling wells. So what we don't know is, the weakness of the government's case is we don't know what was normal. I mean, this almost reads like a civil case, a civil negligence case, rather than a criminal case. The government kept alleging fraud, fraud, fraud, but Target was able to counter with, we drilled for these wells, we drilled for these wells, which they did. So we don't know. You know, the government never proved where was the fraud. We have a man testifying that only 10 percent of wells are commercially successful, and that's all we have. We don't know if that's correct, incorrect, but that's all we can go on in the record. Counsel, as Judge Gilman said, I read the record that you took in nearly $16 million, paid out a little under half a million. Was there testimony about presumably the remainder of the money, you might say, either went for drilling expenses, sales expenses, legitimate, quote, kind of stuff, or went into your clients' pockets? Was there a testimony as to what the division was between those things? There was, Your Honor. There was figures given as to what salaries were paid out. I don't recall the exact numbers, but they didn't seem abnormal. I want to say the principals over a five-year period received $600,000 in salary, if I recall correctly, and a million dollars in bonuses, which is a large sum, but it's divided over a five-year period. The rest of the money the accountant testified was used for, with the exception of the royalties, was used for drilling and legitimate expenses like that. Okay, so when I looked at the figures, if you add up everything that I saw directly that went to, you might say, the conspirators, it might be $3 million, maybe something like that. So your view would be that the other $10 million, $11 million went for relatively legitimate drilling and sales expenses? Yes, sir. I'll ask the government the same question, but that would be a fair ballpark number? Yes, sir. And I say that because there were so many people who testified. I'll just give you briefly. I won't read it all. But we have people they engaged who did wireline data retrieval, geophysical well logging, field work, hired equipment. They spent a lot of money to do this. This was not a fraudulent operation where it was just some sham company. We have people testifying at great length to the efforts they went to to drill this stuff. And so they're trying to be successful here. Beyond that, Judge, I would mention just briefly one other area I'd bring to your attention is the motion for a new trial. What about obtaining permits under the name of Kentucky, Indiana, rather than Target Oil and the whole constructive amendment issue? Could you address that? Well, just briefly, Judge. I mean, in terms of using a company that Mr. Smith owned to get – that he also owned to get a permit would be legitimate. If one company can't do it because of violations, I don't see any reason why the other couldn't. The testimony was that any violations they had were minor based on not capping the wells, and most of them were addressed anyway. Counsel, you talked of it when you began. You said, well, I'm going to talk about the conspiracy. Your client was also convicted of, I think, 11 specific counts of mail fraud. Yes, Judge. Is the argument essentially the same, or is there something about the specific counts that are different from the conspiracy? The argument is the same, Your Honor. Because what they sent out, you know, the main thing they sent out was those brochures, the sales brochures with geological information. My argument would be the same in that they drilled when they said they were going to drill, and it was a speculative business, and the investors were advised that it was. So any deficiency, shall we say, or exaggerations or hyperbole would all fall within puffing rather than fraud? Yes, sir. That's my argument. Okay. Thank you. Thank you, Judge. You have your two minutes for rebuttal. Thank you. Good morning, Your Honors. Jeffrey Blum representing Appellant Christopher Smith. I would like to reserve three minutes for rebuttal. You may. And Christopher Smith has asked me to emphasize in this argument that the reasons for his innocence are the same as for Michael Smith's innocence. So it may sound like I'm talking on behalf of both of them, but I do just represent Christopher Smith. And one thing that I know my client would want is for me to supplement the answer to Judge Gilman's very good questions about the overall functioning of target oil and gas. First of all, geologists do not pick well sites. That's done by the company owners and surveyors and other people because the primary concern with a specific well site, as opposed to the general lease area, has to do with accessibility to roads, ease of drilling through the surface, that kind of thing. And what Ray Garden did was absolutely typical of the oil and gas industry. It's the same stuff he had been doing for many, many different clients, of which Target was the 10th largest one. And he'd been doing this for almost 30 years. And that has to do with using general geology, the regional geology of the area taken from U.S. geological surveys and so forth, we recommend this well because it is in this area, and this area is relatively favorable for finding oil and gas. Every one of those brochures was totally upfront about that. There's no testimony of any lies or misrepresentations in the brochures. Garden was consistent in his testimony, which is repeated through the briefs. And even the Kentucky Board of Registration for Professional Geologists wound up concluding there's no difference between what's in these reports and the Kentucky Geological Survey. The Kentucky Geological Survey is the main geological survey. It's not fraud. Similarly, there's some misstatement of figures. The amount of money Target paid out to investors during a certain limited indictment period was somewhat over $1.5 million, not less than $5 million. And I think this $15 million figure had to do with the entire lifetime of Target as a company, I believe. So it's not anywhere near the disproportion. I know when the government started out, they claimed only $37,000 was paid out to investors. And then it turned out during this one period over $1.5 million was. So as I understood it, the government's figure of $460,000 was from 2003 to 2008. What's the period for which you state the $1.5 million? I thought it's the same, but the brief has the correct answer, and I don't remember quite well enough right now. This is a case where the panel can either affirm the convictions or affirm its belief in the federal rules of evidence, but it really can't do both. Because a number of practices were committed by the government in this case that struck at the very heart of what rules of evidence were about. First of all, as my co-counsels pointed out, it was never clearly stated anywhere, what is the fraud? What are the material misrepresentations? What was the conspiracy? None of that was ever clearly stated. But on the other hand, the government showed a Hollywood movie, The Boiler Room of Fraud by a Wall Street Firm. And they didn't even show the whole movie. They showed seven selected clips of it. I don't know if any of you have ever seen The Boiler Room, but it's a cautionary tale against committing telemarketing fraud and you can go to prison. The video did have some connection to this case in that it was a training tool for the salespeople. And the jury could attach what weight it wanted to to that. So we can't say that it was unconnected to the events that are at issue here. That's exactly the right question, Your Honor. But the answer is the movie was not shown to the jury. The seven selected clips were shown to the jury. Were there testimony that the salespeople had been shown either the whole movie on the one hand or the seven clips on the other hand? Not until the government's brief on appeal. There was no testimony of those clips being shown. The government's brief mistakenly on page 13 identifies these as clips shown to salespeople. However, on, and this is a very important page, so I'll give the page ID number 11652. In a pretrial conference, Assistant United States Attorney Frances Capron admitted that she made the clips. Those clips never existed to show the target closers. They were made before trial, and the purpose was not to influence investors. It was to influence the court and the jury. Did either counsel or counsel on your side ask under the rule of completeness to show the whole movie? In other words, if there wasn't testimony that, you know, as to where these came from, one counter would be to say, you've got to show the whole movie. They objected, yeah, would have been, and tactically, I might have done that in the alternative if I'd been them, but they simply rested on objecting to the whole thing. They said, what is this, showing a Hollywood movie and convicting these clients on a basis? There was testimony that something having from the boiler room was shown to salesmen. Yes or no, Your Honor. There's testimony that salesmen saw it. It was never shown as a training film. They regularly watched films for entertainment at lunch. Now, wait a minute. Chad Williams at page 3688 of the record says he was shown the boiler room for training purposes. Yeah, one person may have said that, but a lot of other salesmen said they never saw it. And also, when they saw it, there was no instruction with it. They just watched it in a casual setting, whether that would be conscription. Well, but isn't that testimony enough to get it in? I mean, you may not like the testimony. You may cross-examine them on it. But if one of the salespeople of this company testified, said, was shown, at least the way Judge Gilman read it was, was shown for training purposes. Well, no matter what, that wouldn't justify putting in seven selected clips that reverse the message of the movie. The movie is, don't commit telemarketing fraud. The FBI will put you in jail. The clips give the message, do this, do that, the other, and you'll be fabulously rich. So what the jurors and the judge were shown was diametrically opposite to the real movie. Judge Boggs says the counsel could have said, under the rule of completeness, let's let the jury see the whole thing. Well, I don't think that movie had any role being there, because it wasn't these defendants' conduct. But instead, 65 references in the transcript, over and over and over, the government kept hammering in, this is the boiler room, this is the boiler room. Counsel, thank you. Your time has expired. Oh, okay. Questions from my fellow judges. You have your three minutes for rebuttal. Yes, thank you, Your Honor. Good morning, Your Honors, and may it please the court. Paul McCaffrey on behalf of the United States. As has been alluded to by counsel, this trial was lengthy, and the briefing on appeal has been voluminous. And having listened to counsel here today, I think that the government's principal brief addresses each of the contentions that they have made in terms of claims of error. Why is this a fraud case? Why is it that the investments didn't work out the way they were trying? It's a fraud case because the misrepresentations and the omissions that were delivered to these investors were done with the intent to get in money, regardless of whether or not oil or gas was ever hit. I mean, I think we would agree the wells were drilled.  But I don't think it made any difference to Target Oil whether those drilling programs were successful so long as they had the investor money in. But is there any proof that, say, three-fourths or two-thirds of this $15 million was siphoned off to the Smiths? The Smiths received – Michael Smith and his wife received salary of about $650,000 in addition to shareholder distributions of $1.3 million. So they got about $2 million out of it. Chris Smith was a salesman primarily, and he was compensated on a commission basis. And he earned nearly $1 million in commission on these sales. So there was certainly a financial benefit to the principals of the company from this fraud. Their brief asserts on page 14 that operating expenses for Target were $8.8 million. Would it be fair to say that those would be relatively legitimate expenses, or where does that figure come from? Is that the drilling costs and that sort of thing? I think that figure came from their CPA, and I believe it did include drilling expenses, other operational costs. But I think the point is that it was a facade of legitimacy here. It didn't matter if they hit oil or not. In order to keep the scheme going, they had to show that they were doing something. If they had just taken the money— Well, counsel, let me put it to you this way, and obviously the jury made its own determination, but if I were looking at these numbers and they took in $15 million and spent $1 million to drill and kept $14, that looks like fraud. If they actually drilled $8 or $6 or $8 or $10 million, then it gets a little closer, doesn't it? I mean, don't lots of oil companies take in $15 million, drill $10, and hit nothing? They might. I don't know what other oil companies do, but the success of the fraud is not the point. The point is, were the misrepresentations and omissions that these salespeople and this company made to investors, were they material and did they induce these investors to send the company money that, whether it was used or not for drilling expenses or whether it went to the Smith's bottom line, the point is that they lied to these investors in order to get their money. How did they lie? Well, there were multiple misrepresentations, but to give a few examples, Shannon Williams was the young geologist right out of college who was allowed to call himself a senior geologist a month or so on the job. Chris Smith asked him to draw pools of oil on a 3D isopatch map representing oil that would be presumably recovered. And Williams testified that there was no geological basis for that. He just drew it on the map that was sent to investors at Chris Smith's request. Likewise, Chris Smith would make representations to investors with very specific sums of money that they could expect to receive from these, in their words, speculative drilling programs. If it's so speculative, then any statement to an investor that you will receive, for example, $1,900 a month in royalties is not just puffing. That's a misrepresentation. And there are numerous other examples. I think Mark Irwin was one of the other closers. He acknowledged to embellishing facts, to omitting negative facts. And, in fact, what he said was Chris Smith was the main closer. And so if he was having difficulty closing a deal, they would bring in Chris Smith to get on the phone with the investor. And he would tell Chris what embellishments he had made, what omissions he had failed to disclose, presumably so that Targot Oil could keep its story straight. When you talk about omitting negative facts, I've certainly seen that come up, the argument about failing to disclose when you had an obligation to disclose. But usually you see this in sort of big commercial prospectus documents that are gone over. What do you see as the law when you're on the telephone with somebody and a lot of times you say, well, you didn't tell him X, you didn't tell him Y. What's your best law that that counts as fraud in a salesman face-to-face context? I don't know that I could give you a case, Your Honor, but I think if an investor is asking questions or even if the salesperson is just giving information and they're aware of material negative facts that would go to that investor's decision and they're consciously withholding that information from the investor, then that's an omission, a material omission. And you don't think there's any law that's any different in what I call the face-to-face sales context as opposed to a bank prospectus or a bond prospectus, that sort of thing? Not that I'm aware of for purposes of a mail fraud count such as this. I mean, there were security charges at one point and those were dismissed, but this was just mail fraud conspiracy to commit mail fraud or wire fraud. You know, you made the statement that they didn't really care to dismiss whether they hit oil or not. They just wanted to have the money keep coming in. There's certainly a logic there, isn't there? Because if they kept that up in the long term, obviously their whole business would fail. I mean, if every time in the history was investors who put their money in and never got much out, that can't continue on for very long. And, in fact, it didn't. I mean, I think that was the problem. Investors began complaining and that's how this came to a head. I mean, investors were not receiving their money back. There was testimony from numerous investors about the amounts that they had put in and receiving nothing back or $800 back, something to that effect. I just want to ask you about this question between whether the investors got half a million or a million and a half. The other side's brief quotes the million and a half figure as being from 03 through 10. I think your figure at some point was from 03 through 8. Do you have any quarrel that there was another million paid out between 8 and 10? No. I think that if I'm recalling the record, there was a well that was quite successful and that well paid out good money to investors after the indictment period. And so during the loss calculation at sentencing, the court used that $1,500 figure, gave them credit for royalties that were paid out after the schemes period. So that even though they were indicted, some of the wells continued to produce or were wells drilled after the indictment or were they just paying out? Yes, to both. Wells were drilled after the indictment. That's my understanding. I'd like to shift the discussion, if I could, Your Honors, to the government's cross appeal. And at issue here is the district court's decision to grant a motion for acquittal on count 17 as to Christopher Smith. As you know from the briefs, the jury was instructed that they could find liability on the mail fraud counts, either based on the defendant's personal involvement or based on the Pinkerton theory of vicarious conspiratorial liability. And the evidence, I think, was overwhelming that Chris Smith was a part of this conspiracy. The evidence was, frankly, there was no direct evidence of his personal involvement in the drilling program at issue on count 17. The jury convicted him on count 17 but acquitted of the conspiracy charge. And they also acquitted of a large number of the individual counts, right? That's right. And effectively they acquitted on all of the counts that were a time period subsequent to 17. That's correct. As well as a couple that were immediately before 17. And the judge dismissed number 15, which was also just before that time period. So in terms of consistency, at least, there's a certain consistency that 17 is the only count that stands after early 2006. So number one, where's the inconsistency? And number two, why is it important to the government if you prevail on everything else? Well, I think the inconsistency is that this gentleman, Chris Smith, was involved in a conspiracy. And you had an instruction that if he was involved in a conspiracy and did not withdraw, and the acts of his co-conspirators were reasonably foreseeable, that they could find him liable. Right, but he had withdrawn, what, eight months before the particular well in question on count 17? He had left Target Oil's employment. But as a legal matter, he never withdrew from the conspiracy. It's not as if he went to the authorities and alerted them to the fraud, or if he went to investors and told them, look, you've been hoodwinked. He simply left employment with Target Oil. So he was still in the conspiracy for legal purposes. And as far as how you reconcile the verdict, I don't think you can. And that's the point. It's not the district court's decision to try to make sense of the counts that the jury acquitted on versus convicted on. When they moved for acquittal on count 17, or when Chris Smith moved for acquittal, the district court's obligation was to review the evidence and determine if he could have been convicted either based on his personal involvement or under a Pinkerton theory. And the district court concluded that there was not sufficient evidence to convict based on his personal involvement, but the district court did not undertake any analysis under Pinkerton. And that's where we claim error, Your Honors. The fact of acquittal on the conspiracy count alone does not permit the district court to simply— Your theory is that even though he left employment, he remains a conspirator forever until he formally renounces? Is that your theory? No, I think the end point comes when the acts of his co-conspirators stop being reasonably foreseeable to him. If the company had kept going 10 more years after he quit, he'd still be a conspirator? I think at a certain point, their actions stopped being reasonably foreseeable, but here— I mean, he was employed at the time they obtained the lease for this drilling program. I mean, he presumably knew that they were going to drill at this site. I think the jury could infer that. And the count 17 was based, though, on the receipt of a Kentucky authority to drill, right? That's correct. Which was not sent until—was it applied for at some time when he was still employed? I don't believe so. I'm not sure the evidence was clear on that point, Your Honor. I mean, what you say, he only would have affirmatively known that they had a lease to the general area? Correct. But there was a clear process, and I think the evidence showed there was a clear process that this company went through. They obtained a lease. They selected a drilling site with the assistance of the owner of the property. They applied for permits. They put together a program where they solicited investors. I mean, that process was followed through with respect to each drilling program. And what about my question about why is count 17 important to you? Does that affect sentencing or anything, assuming you were to prevail on their appeal? It may affect the restitution amount that Chris Smith may be ordered to pay on resentencing. In terms of calculation of loss, Your Honor, at sentencing, the district court found that the amount of loss attributable to him was in excess of $7 million, so that already puts him into this 20-level enhancement. That wouldn't change with the addition of count 17. So from a practical point of view, there really isn't much difference, is there, as to count 17? I mean, you said the amount of restitution, but I can't imagine that you could rope in much from this one receipt. I believe there was something in the order of $750,000 in investor funds taken in under Bell County No. 1. But as a practical matter, that would be the effect. As a legal matter, there was a clear error here, and that's the purpose of the appeal. Okay. So we think under the law of the Sixth Circuit, where Pinkerton instruction has been given to the jury, even in the event of acquittal of conspiracy, on a motion for acquittal, the district court still needs to review the evidence to determine whether or not that individual was within the conspiracy and whether or not the acts were reasonably foreseeable to that individual. The fact that the jury found he was not a member of the conspiracy doesn't matter? No. And here's why. I think this is the point that the Powell Court was trying to make in its Supreme Court decision. All you know from the jury verdict is that he was acquitted. You don't know that their conclusion was he was not a part of the conspiracy. It may have been a mistake. It may have been a compromise in order to get a conviction on another count. That's what the Powell Court was saying. You don't know whose ox has been gored, I think was the phrase they used. But having given the instruction that Pinkerton liability could attach, the district court is still obligated to review evidence to see if that was a basis for liability on the substantive count. There's two different legal theories, two different sets of evidence that could sustain the conviction, and here the district court only looked at one set of evidence. It's personal involvement in this drilling program. So if the judge's failure was effectively the failure to consider the proper legal theory, and we were to reverse, would it simply be back to the judge then to say, okay, you told me to think about it harder, and he could then issue a new opinion, or would it be required to reinstate the conviction? I think it could go either way. I mean, I think the standard here is could any rational trier of fact have found the essential elements beyond a reasonable doubt? So could any rational trier of fact have found that Chris Smith was involved in this conspiracy and that this drilling program was reasonably conceivable? You're saying the district judge did not answer that question. He did not. Okay. So then either we would have to answer it in the first instance or he would remand and say, okay, you need to consider it in this fashion. That's correct. Right. Right. I mean, he simply looked at the fact of acquittal, and that was it. And he looked at the fact that he had left the employment. He will pass on the word withdrawn, but he was no longer involved in the company in order to have any direct or even inferential. I'll pass inferential. To have any direct involvement or even any evidence of connection to this particular event. That is, there wasn't anything that he did before he left that was connected to this event. You rely on the fact that he was still in the company and potentially in the conspiracy at the time of the general lease. Right? Correct. Right. Anything else? Okay. Thank you. All right. Thank you, Your Honors. All right. Mr. McKenna, you have two minutes for rebuttal. Your Honors, just briefly in rebuttal. The court or the government goes on in their argument about how the target oil, Mr. Smith, intentionally defrauded investors. But that's the weakness of their case. It's true that the success of a fraud is immaterial. It's not an element. But you have to have intentional fraud. And here we have a company that spent enormous sums and hired an enormous amount of people to do a lot of work. The record is so large in part because they had to interview so many people who did work for them, whether it was drilling or clearing roads or doing any kinds of locating wells and whatnot. You know, the government can cite no law that says what they're required to disclose. I don't know that there is any here. They didn't put on an expert to say what is required. You know, we have investor after investor. I'll just cite a few. You know, Vincent Guerreri, who says, hey, I did research. I don't get in anything without checking it out. And, hey, it's a bad investment. But, you know, it was speculative. Other investors said the same thing. We know this is a risky business. That's what it is. This is the oil business. Some people make it big. Some don't. Maybe they didn't run their company in the best way. That's not for me to say. I don't know. I'm not in that business. From the jury's point of view, though, if some investors say, you know, bad luck, I wasn't defrauded, and others say they were defrauded, can't the jury make that determination? It's like if you've got three people who came in and said he didn't kill me, that doesn't prove he didn't kill somebody else. I agree, Judge. But there are so many people who said they weren't defrauded. And at the end of the day, the evidence is the same for both of them, for both sides. The brochures that sent out, which is the mail fraud, didn't contain fraud. They advised these savvy investors to do their research and that it was speculative, and for that reason it wasn't fraud. Thank you. Thank you. Mr. Blum, you have three minutes for rebuttal. Well, the panel has certainly zeroed in on the big question, what is the fraud? And the answer that the government gave was it was misrepresentations and omissions. Okay, that's a good start. What misrepresentations, what omissions? The idea of omitting not including state cease and desist orders certainly wasn't, because those had nothing to do with these wealth projects. All those were about is you have to register in our state in order to solicit investors in our state, and most of these small companies don't try for all 50 states. They just accept the C&D and don't proceed there. The case got going because the government confused those with SEC cease and desist orders, which do have to do with actual wrongdoing. Now, what was the one specific example, their best shot at the misrepresentation, the fraud? It was drawing a schematic diagram of a well, a derrick, imposed on top of an isopatch thickness map, and the well included a black dot under it, meaning this is an oil well. We're going to drill for oil here. No reasonable investor is going to look at that and say, oh, well, the proposed well site is guaranteeing oil under the proposed well site, because that wouldn't make any sense. The thing you're talking about now, is that the same thing as the geologist drawing the line with no basis? Yeah, that's Shannon Williams' testimony, and that's it. That's nothing. Now, think about the government's brief. They make the allegation of fraud. They were real good at making allegations, but then they put in 60 citations to the record of this fraud, and I went through all of those, and I did my best to summarize the actual testimony in 12 pages, but look to the primary sources. Zero out of 60, every one of their 60 citations was about something else. I started at Walmart first, so on and so forth. Nothing to do with fraud. Now, zero out of 60, nobody has a batting average that bad, not even our favorite baseball team at playoff time. Zero out of 60 means the government is really, really stretching to find fraud, and just can't find it anywhere, and that's why they rely on things like the isopatch thickness map, and its schematic diagram of a pool of oil. But the real testimony, eight salesmen all testified they were told not to lie. No one says Michael Smith or Christopher Smith told me to lie. Ten drillers and other types of employees like that say, I worked with Target for years. They look like a fully legitimate company in everything they did. They didn't do the stuff that shady companies do. That's ten out of ten saying, nope, no fraud out in the field as far as any of us could see, and what the government has is very forceful closing argument where I'm out of time. Any questions? Questions, judges? Thank you, counsel. I didn't hear anything that would allow rebuttal on your claim. Cases will be submitted, and the clerk may call the next case.